The VIRGIN ISLANDS BAR ASSOCIA-
TION, Britain H. Bryant, John E.
Stout, Plaintiffs,

v.

The GOVERNMENT OF the VIRGIN
ISLANDS, Defendant.

Brenda J. HOLLAR, Stedmann Hodge,
Charlotte L. Poole-Davis, and Clarice
A. Bryan, Plaintiffs,

v.

The GOVERNMENT OF the VIRGIN IS-
LANDS, Virgin Islands Bar Association
and District Court of the Virgin Is-
lands, Defendants.

Petition to DISINTEGRATE the
VIRGIN ISLANDS BAR
ASSOCIATION.

Civ. Nos. 84/38, 84/5 and 85/193.

District Court, Virgin Islands,
D. St. Thomas and St. John.

Oct. 2, 1986.

James W. Diehm, Christiansted, St. Croix, V.I., for U.S. Dist. Court.

J'Ada Finch-Sheen, Charlotte Amalie, St. Thomas, V.I., for Government of V.I.

Brenda J. Hollar, Charlotte Amalie, St. Thomas, V.I., for plaintiffs Hollar, Hodge, Poole-Davis and Bryan.

Judith Turner, Christiansted, St. Croix, V.I., for V.I. Bar Assn.

Frank Padilla, Frederiksted, St. Croix, V.I., for petitioner in Civ. No. 85/193.

## OPINION

ANNE E. THOMPSON, District Judge.

The consolidated matters before us are concerned with the requirements imposed upon attorneys by the Virgin Islands government attendant upon the privilege of practicing law in that Territory. The plaintiffs' complaints focus on two factors: the increase in the licensing fee for attorneys from $100 to $500 per year, and the creation of a unified ["integrated"] bar association in the Virgin Islands, membership in which is mandatory for all practicing attorneys.[1]

### I. Introduction

In 1955, members of the Virgin Islands Bar Association (then a voluntary organiza-

---

**1.** Three cases have been consolidated under the above caption. In 84/5 four attorneys challenge the constitutionality of the fee increase and the requirement that they join the bar association. They also assert claims related to the assessment and enforcement methods employed for the collection of bar dues. Defendants in 84/5 are the Government of the Virgin Islands, the Virgin Islands Bar Association (the integrated bar association of the territory) and the District Court of the Virgin Islands.

In 84/38, the Virgin Islands Bar Association and two of its members challenge the constitutionality of the fee increase. The defendant in 84/38 is the Government of the Virgin Islands.

Civil No. 85/193 is the petition of Frank Padilla, an attorney licensed to practice in the Virgin Islands, addressed to the District Court, and seeks the revocation of the order making membership in the Virgin Islands Bar Association mandatory. Civil No. 85/193 was consolidated with Civil No. 84/5 and Civil No. 84/38 during the pendency of the summary judgment motions addressed in this opinion. While no motions are pending with regard to requests contained in Civil No. 85/193, we briefly address the issues raised in the petition in Part VI, *infra.*

tion of attorneys) petitioned the District Court of the Virgin Islands for an order integrating the bar. Misc. No. 11–1955. The draft rules filed with the petition contained the following preamble:

> For the advancement of the administration of justice according to law, and for the advancement of the honor and dignity of the legal profession, and encouragement of cordial intercourse among the members thereof, for the improvement of the service rendered the public by the Bench and Bar, there is hereby organized, created and formed the VIRGIN ISLANDS BAR ASSOCIATION.

An order integrating the bar was signed by the Honorable Herbert E. Moore on March 2, 1956. The initial paragraph of that order read as follows:

> The petition of the Virgin Islands Bar Association for the integration of the Bar of this jurisdiction having come on for hearing and this matter having been fully considered by the Court, and the views of the individual practicing attorneys having been heard, and after due deliberation thereon and the court being fully advised in the premises, and this Court now being of the opinion that integration of the Bar of this jurisdiction is in the best interest of the Court and the Bar and the administration of justice in the Virgin Islands ...

The Legislature of the Virgin Islands voiced its approval of the rules associated with the order the following year; the rules, as amended by court orders, are currently codified at 5 V.I.C. App. V, Part III. The rules discuss, *inter alia*, the powers of the integrated Virgin Islands Bar Association ["VIBA"], the membership requirement, and the means for adopting and amending bylaws. Dues for members are currently $100.00 per year.

In 1967, the Virgin Islands legislature passed legislation providing for the collection of license fees for persons and organizations engaged in businesses or trades. 27 V.I.C. § 302. In 1983, the Virgin Islands legislature considered legislation which would raise the level of licensing fees; at that time the fee for attorneys was $100.00. Pursuant to 4 V.I.C. § 442, all license fees paid by attorneys was paid over to the Law Library Fund, to be used for the maintenance of the law libraries in the judicial divisions of the District Court.

In 1983 the Director of the Virgin Islands Consumer Service Administration, Helen Joseph, was asked by the legislature to prepare a schedule of proposed changes in the licensing fees. (Deposition of Helen Joseph, Exhibit A to brief of VIBA in support of its motion for summary judgment [hereafter, "Joseph"], pp. 21–24). License fees were increased as part of the Omnibus Authorization Act of 1984, Act No. 4877, uniformly by the amount recommended by Helen Joseph and her staff. For attorneys the fees were raised $500 annually. *Compare,* Exhibit B to brief of VIBA in support of its motion for summary judgment (CSA recommendation), with Act No. 4877, pp. 20–28 (increases adopted by legislature). The following year 4 V.I.C. § 442 was amended to designate only $200.00, rather than the entire $500.00 of the license fee, to be paid over to the Law Library Fund. The $300.00 balance of the license fee was paid to the General Fund of the Treasury of the Virgin Islands.

The plaintiffs in Civil No. 84/5 challenge these developments at each step. They challenge the order integrating the bar as beyond the power of the judiciary acting alone; they challenge, on First Amendment grounds, both the validity of bar integration in general and the validity of the VIBA's actions since its integration; they assert that they have been deprived of due process by reason of the summary method employed by the District Court in ruling on disciplinary matters; and they argue that the increase in the licensing fee is confiscatory, a "double tax," arbitrary, and discriminatory to attorneys as a class.

The plaintiffs in Civil No. 84/38 assert that the fee increase is arbitrary and unrelated to any legitimate governmental purpose, and therefore that it violates their rights to equal protection under the law as guaranteed by the Fourteenth Amendment.

The petitioner in Civil No. 85/193 asks that the VIBA be made a voluntary orga-

nization, apparently for many of the reasons advanced by plaintiffs in Civil No. 84/5.

We will first address the motion of the plaintiffs in Civil No. 84/5 insofar as it is addressed to the issues related to the integration of the bar. We will then address the fee increase. Finally, we will address the remaining issues, including the due process claim, the motion of plaintiffs in Civil No. 84/5 to amend the complaint, and the various non-constitutional challenges to the VIBA's activities.

## II. The Integrated Bar

The plaintiffs in Civil No. 84/5 argue that the very fact of the integration of the bar violates their First Amendment rights of free speech and free association. This stark assertion does not present a question of first impression. We are not directed to any support in the case law for the argument, and we have found none through our own research.[2] The contrary authority is overwhelming. Many states have considered like challenges to the integration of their bars, and all have found that the integration does not infringe on the individual rights of attorneys in an impermissible manner. *See, e.g., Petition of Rhode Island Bar Association*, 118 R.I. 489, 374 A.2d 802 (1977); *Falk v. State Bar of Michigan*, 418 Mich. 270, 342 N.W.2d 504 (1983). The United States Supreme Court in *Lathrop v. Donohue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), found that the integration of a state bar through an organization strikingly similar to the VIBA did not, in and of itself, violate the constitutional rights of attorneys in that state.[3] In *Lathrop* the Court found that the Wisconsin Supreme Court could "reasonably believe" that the integration of the

bar was a suitable and proper means of improving the legal services enjoyed by the citizens of the state, and that,

> the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity. Given the character of the integrated bar shown on this record, in the light of the limitation of the membership requirement to the compulsory payment of reasonable annual dues, we are unable to find any impingement upon protected rights of association.

367 U.S. at 843, 81 S.Ct. at 1838.

The language quoted above reflects the decision of a plurality of four justices. Those four justices determined that the First Amendment issues raised with respect to *specific* "political" acts of the bar association were not properly before the court. Three justices concurred in the result, but would have reached the specific First Amendment issues, finding in favor of the bar association. 367 U.S. at 864–65, 81 S.Ct. at 1849 (opinions of Harlan, J., and Whittaker, J.). Seven justices, then, agreed that an integrated bar association, even one which "engages in some legislative activity," does not impermissibly infringe on the First Amendment rights of attorneys compelled to join as a condition of practicing law.

■ At Count V of their complaint, the plaintiffs in Civil No. 84/5 contend that the

---

**2.** The only authority we find to the contrary is Parker, "First Amendment Proscriptions on the Integrated Bar: *Lathrop v. Donohue* Re-examined," 22 Ariz.L.Rev. 939 (1980). The thesis of this article is that the courts which have uniformly decided this issue in favor of the integrated bar have incorrectly decided the issue. We find the reasoning of this article ultimately unpersuasive.

**3.** The similarity between the bar association examined in *Lathrop* and the VIBA which we note at this point is the legitimate, non-political em-

phasis of 'both. The details of this characterization of the VIBA appear below; at this point, suffice it to say that the VIBA clearly is not "a sham organization deliberately designed to further a program of political action." *Lathrop*, 367 U.S. at 834, 81 S.Ct. at 1833. Rather, it is an organization primarily devoted to the continuing legal education of attorneys, the investigation of grievances against members of the bar, and the encouragement of communication among members of the bar.

order integrating the bar was ineffective because "[i]n order to integrate a bar association, the legislature must pronounce that the general welfare of the populace requires the bar to be treated as a corporate body." In their brief in support of their motion for summary judgment, these plaintiffs argue that this contention is supported by language in *Lathrop*, 367 U.S. at 825, 81 S.Ct. at 1828, where the Court notes that the Wisconsin bar was integrated "through an interplay of action by the legislature and the court directed to fashioning a policy for the organization of the legal profession." This language in *Lathrop* does not support the plaintiffs' argument that interplay between the legislature and the courts is a *necessary* predicate for the integration of the bar. The Court referred to the history of the integration for the purpose of determining the presence *vel non* of appellate jurisdiction. 367 U.S. at 824, 81 S.Ct. at 1828.

State courts which have addressed the question of whether the highest court of a jurisdiction has the inherent power to order the integration of the bar without legislative input have uniformly answered in the affirmative. *See In re Unification of New Hampshire Bar*, 109 N.H. 260, 248 A.2d 709 (1968); *Petition of Florida State Bar Association*, 40 So.2d 902 (Fla.1949); *see also Attwell v. Nichols*, 608 F.2d 228 (5th Cir.1979) (Georgia law). These plaintiffs have directed us to no provision of Virgin Islands law which restricts the District Court's supervisory power over the practice of law in the Virgin Islands. We have been unable to locate any such authority, and we will dismiss this challenge to the integration of the bar as wholly unsupported.

Although plaintiffs in Civil No. 84/5 argue vigorously that the integration of the bar was flawed at the inception, the heart of their challenge is their argument that the VIBA has undertaken a course of conduct which is skewed toward political action and social activity, and little concerned with the improvement of the practice of law, and that their First Amendment rights are being violated by these specific actions.

We have been provided with considerable evidence, in the form of financial records and affidavits, which aid in the assessment of these plaintiff's claims.

The activities of the VIBA are governed, pursuant to the order of integration, by a formal set of bylaws. Section I of the bylaws describes the sole obligation of attorneys to the VIBA—the payment of dues. The section also describes the means by which attorneys may participate in the government of the VIBA. Sections II through VIII describe the offices of the board of governors and the executive officers of the VIBA, and the procedures by which votes are taken to fill those offices. Section IX describes the standing committees of the bar association, of which there are eight.

The Legislation and Law Reform Committee has the duty to "advocate, by proper and ethical means, the adoption or repeal of such legislation as may be recommended by the Board of Governors and the Bar." Bylaws, page 7 (as amended, 1982). The object of this committee is described as follows:

> to improve the administration of justice, and in attaining this object it shall be the duty of the committee to keep under continuing study the laws being enacted, the organization and administration of courts, methods of judicial selection, tenure and retirement and compensation of the judiciary, the system of practice and procedure in use, with due emphasis upon the correction of deficiencies; and to study and evaluate the trends and reforms in practice and procedure in other jurisdiction[s], in substantive law or procedure.

*Id.* The Legal Education and Admission to the Bar Committee has the duty of aiding the District Court in the oversight of bar admissions, and the duty of providing continuing legal education opportunities for members of the bar. The Unauthorized Practice of Law Committee is charged with the investigation of reports of the practice of law by persons not authorized to do so. The Professional Ethics and Grievance Committee has the duty of investigating

complaints made regarding the professional conduct of members of the bar. The Public Relations and Entertainment Committee has two tasks: First, it is charged with facilitating good relations between the bar and the public which it seeks to serve. The means to be used by this Committee to communicate "the lawyer's story" are:

Press news stories, press releases, editorials, correction of misleading articles, magazine articles, speakers' bureaus and panels, radio and television, motion pictures, pamphlets, folders and mailings, institutional advertising contents and awards, meetings.

*Id.*, at p. 10. The Judiciary Committee investigates and evaluates judges and judicial candidates. The Bar Journal Committee publishes the Bar Journal and the Law Letter of the VIBA. The George H.T. Dudley, Sr. Scholarship Committee is charged with raising funds for and overseeing the management of a fund used for granting scholarships to students interested in practicing law in the Virgin Islands.

These committees are similar to those of the State Bar of Wisconsin, as described in *Lathrop*. 367 U.S. at 829–31, n. 7, 81 S.Ct. at 1830–1832, n. 7. As we noted above, the United States Supreme Court found in *Lathrop* that an integrated bar organized around these committees is not, on its face, violative of individual attorneys' free speech and association rights.

The plaintiffs in Civil No. 84/5 argue that the facial validity of the bylaws does not immunize the actions of the VIBA from First Amendment scrutiny. They argue that they have presented a valid First Amendment claim if they can establish that a constitutionally proper bar association expends its members' involuntary dues on law reform issues with which they do not agree or on social events of which they do not approve. This issue was left open by the divided *Lathrop* Court. Through affidavits and exhibits these plaintiffs have detailed those activities which they believe violate their speech and association rights.

The deposition of Clarice Bryan (who happens to be one of the signatories of the 1955 petition to Judge Moore for the integration of the bar) dated May 7, 1985, describes in narrative form that attorney's grievances against the VIBA. Much of the affidavit is devoted to trenchant criticism of the management of the VIBA of the last 15 years. Bryan's description paints that leadership as unresponsive to at least a large segment of the membership, and as more interested in their own professional advancement than in the goals of the VIBA. She also describes the social events hosted by the VIBA as "terrible." Bryan affidavit, ¶ 11. The only statements related to public law reform activities of the VIBA are contained at ¶¶ 7–8 of the affidavit. In those paragraphs, Bryan testifies that in two conventions organized for the purpose of considering the drafting of a constitution for the Virgin Islands "the leadership" of the VIBA espoused positions with which she did not agree, and which had not been approved by the membership of the VIBA. On one occasion, she testifies, an *ad hoc* committee, purporting to speak for the VIBA, transmitted an opinion to the United States Senate, which opinion did not reflect the view of the bar membership. This opinion apparently dealt with proposals for the creation of an interim appellate court and the utilization of the grand jury system in the Virgin Islands.

Brenda Hollar has also submitted an affidavit, dated May 21, 1986, by which she testifies as to the activities of the VIBA of which she disapproves. In ¶¶ 6–11, Hollar describes the activities of the VIBA in connection with the constitutional conventions discussed in the Bryan affidavit. Hollar also raises the issue of the statement of the *ad hoc* committee of the VIBA raised by Bryan. The statement which both affiants find objectionable was made Exhibit 8 to the brief of the plaintiffs in Civil No. 84/5 in support of their motion for summary judgment. The document clearly describes a process by which the committee reached its decisions based on compromise and the exercise of judgment as to which aspects of the particular piece of legislation had to be accepted in the interest of ensuring the

passage of a bill which the committee found to be generally positive.

At ¶ 12 of her affidavit, Hollar discusses an incident in which the VIBA took a public position against the appointment of a Virgin Islands attorney as United States Attorney for the Virgin Islands. *See* Exhibits 18 and 19 to plaintiffs' brief. Paragraphs 13–15 concern public positions taken by the VIBA in other areas, and make reference to Exhibits 20–26 and 30 to plaintiffs' brief. These documents disclose the VIBA's decisions to take public positions on questions related to labor unrest in the Virgin Islands, and on certain legislation pending before the legislature. The balance of Hollar's affidavit discusses specific expenditures for social activities, and her perception that the leadership of the VIBA is insufficiently responsive to the feelings of the membership. The affidavit of Charlotte Poole Davis, dated May 7, 1985, has also been received. Davis testifies that her membership in the Seventh Day Adventist religion precludes her from attending the social events and the general meetings of the VIBA which are scheduled on Saturdays. Her religion also prohibits her from taking part in some of the social activities, such as dancing and consuming alcoholic beverages.

The VIBA has also submitted documents and affidavits on these questions. The affidavit of R. Eric Moore, dated May 20, 1985 indicates that most of the social events sponsored by the VIBA during 1984 and 1985 were self-supporting. The exceptions were the cocktail parties held during the sitting of the Third Circuit in the Virgin Islands. Those parties were partially funded through bar dues, and partly through the $15.00 fee paid by each attending attorney. The affidavit dated April 10, 1985, of Rhys Hodge, President of the VIBA in 1985 and a member of the Board of Governors since 1980 details the extensive activities of the VIBA in the areas of continuing legal education and the provision of library and newsletter services. At ¶ 19, Hodge testifies:

> Since I have been on the Board of Governors, the V.I. Bar Association has not paid any money to any political action committees or to support any partisan political candidates or political activities, or to support or defeat any proposed legislation. The V.I. Bar Association has not supported any political candidates."

The affidavits of Richard Hunter, dated May 22, 1985, and of John James, dated May 17, 1985, describe work performed by the VIBA in investigating the unauthorized practice of law and grievances against attorneys in the Virgin Islands. The affidavit of Patricia Steele dated April 9, 1986, describes the method by which the VIBA develops an official opinion on a legislative issue. The issue is, pursuant to this method, submitted to a vote of the members attending a general meeting. At ¶ 9 of her affidavit, Steele testifies that "[t]here may have been one or two instances in the past, such as the V.I. Bar Association's actions with respect to the proposed U.S. Attorney in 1982, wherein the requisite procedure was not followed."

We have also examined the financial records produced by the VIBA. The following chart illustrates the expenses incurred by the VIBA in 1983, 1984 and 1985, by category of disbursement. The figures in the charts are approximations, and include only the categories for which substantial disbursements were recorded.

1983 – Total expenses = $28,787.78

| Category | Approx. Amt. |
| --- | --- |
| Office expenses and equipment rental | 12,500 |
| Library, publication and opinion service | 4,500 |
| Continuing legal education and Third Circuit Conference | 5,500 |
| Grievance Committee | 1,500 |
| Entertainment | 2,500 |

1984 – Total expenses = $32,101.19

| Category | Approx. Amt. |
| --- | --- |
| Office expenses and equipment rental | 5,000 |
| Library, publication and opinion service | 4,300 |
| Continuing legal education | 7,500 |
| Entertainment | 3,100 |
| Legal services (related to this action) | 8,500 |

1985 — Total expenses = $33,240.21

| Category | Approx. Amt. |
| --- | --- |
| Office expenses and equipment rental | 9,500 |
| Library, publication and opinion service | 5,000 |
| Continuing legal education | 3,000 |
| Entertainment | 5,000 |
| Legal services (related to this action) | 8,000 |

We have examined the documentary evidence provided by the parties, and we have had the opportunity to hear two days of oral argument. The two sides in this particular aspect of the case—the plaintiffs in Civil No. 84/5 and the VIBA—have very different subjective views of the value of an integrated bar, the quality of the present leadership of the VIBA, and the proper functions of a bar association. We find, however, that they have no factual differences regarding the activities of the VIBA which are material to this action. The undisputed record demonstrates that social activities are a substantial component of the VIBA's function. The record also demonstrates, however, that much of the money expended by the VIBA for social events is recouped through user fees, and that the planning of the social events is separate from, and does not interfere with, the more serious business of the association.

The extent of the VIBA's political, or legislative activity is also established by the present record. The parties agree that the VIBA has taken public stands on constitutional initiatives and on pending Virgin Islands legislation. The record is also clear, however, that the VIBA does not pay lobbyists, and that their legislative activities are largely limited to testimony before the Virgin Islands legislature and informative statements and press releases. It is undisputed that dissenting members are free to speak publicly in opposition to the VIBA's opinion, and that the VIBA has a policy, to which it usually adheres, of presenting legislative issues to the membership at general meetings prior to its formulation of a public opinion. It is undis-

puted on this record that the VIBA does not poll its members, or attempt to ascertain the majority's opinion on a legislative topic by any means *other* than through the device of conducting a vote at general meetings.

The dispute which does exist is the question of the accurate characterization of many of the public statements which the VIBA has taken. The plaintiffs in 84/5 characterize the positions taken by the VIBA as intrinsically political, divisive, and out of touch with the views of a substantial portion of the membership. The VIBA regards the opinions which it has expressed consonant with its duty to communicate to the public factual material, and associated interpretation, which will be of assistance to the public in dealing with issues peculiarly within the knowledge of attorneys. Examples will help illustrate the nature of the dispute.

At ¶ 14 of her affidavit, Hollar states that the VIBA "has taken positions with respect to union disputes" which were not previously submitted to the membership for approval. The document cited in support of this assertion is Exhibit 21 to plaintiffs' brief in support of their summary judgment motion. The document appears to be a press release of the Board of Governors of the VIBA, and it discussed a labor action involving teachers and the government of the Virgin Islands. The statement "condemns the violence which has erupted as a result of the ongoing dispute and strike," and encourages the parties to resolve the dispute. It goes on to state that while the authors do not "pass judgment on the merits of the bargaining positions of either side, we feel obliged as lawyers and officers of the court to state that the laws of this Territory as enacted by the Legislature, approved by the executive and interpreted by the courts must be obeyed." We find this document to be far from controversial.

The approval or disapproval of a constitution for the Virgin Islands, in contrast, is an issue which must, by its very nature, be an issue upon which members of the VIBA,

and the citizens of the Virgin Islands in general, will have strongly felt and widely divergent views. The plaintiffs in 84/5 regard these issues as clearly beyond the proper scope of a mandatory professional organization, while the VIBA regards the analysis for public consumption as central to its role as the unified organization of attorneys in the Virgin Islands.

Our evaluation of the VIBA leads us to the conclusion that it presents a responsible, non-partisan, low profile character. It is not a highly political, controversial bar association like that in Puerto Rico, *see Schneider v. Colegio De Abogados De Puerto Rico*, 565 F.Supp. 963 (D.P.R.1983) *vacated and remanded* 742 F.2d 32 (1st Cir.1984), or California, *see Keller v. State Bar of California*, 181 Cal.App.3d 471, 226 Cal.Rptr. 448 (1986). It does not expend funds in lobbying efforts. *Cf. Arrow v. Dow*, 544 F.Supp. 458 (D.N.M.1982). There is no question, however, that First Amendment rights of the plaintiffs in Civil No. 84/5 are implicated by the expenditure of even a small fraction of their mandatory dues for causes which they oppose.

The question with which we are presented, then, is a legal one: may attorneys be compelled, consistent with the First Amendment, to pay dues to a bar association which spends a portion of its revenues on social functions and which takes public positions with which the attorneys do not agree?

We are not presented in this case with a situation wherein we may avoid the constitutional question by construing the relevant statute or rule in such a way as to avoid a constitutional decision. *Cf. Ellis v. Railway Clerks*, 466 U.S. 435, 444 ff., 104 S.Ct. 1883, 1890, 80 L.Ed.2d 428 (1984). In this case, our examination of the undisputed factual record makes it clear that the activities discussed above are consistent with the mission of the VIBA as described in the enabling order and the rules and bylaws associated with it. We are squarely presented with the constitutional question.

As we have noted above, the *Lathrop* Court held that the First Amendment is not violated if attorneys are compelled to support a bar association, "even though the organization created to [raise the quality of legal services] also engages in some legislative activity." 367 U.S. at 843, 81 S.Ct. at 1838. The Court found the impairments to the dissenting members' association and speech rights insubstantial when balanced against the legitimate state policies which lead to the integration of the bar. *Id. See International Association of Machinists v. Street*, 367 U.S. 740, 748, 81 S.Ct. 1784, 1789, 6 L.Ed.2d 1141 (1961). The Court found the record as to the specific "political" conduct of the bar association too poorly developed to allow for the adjudication of the claims as they related to that conduct. 367 U.S. at 845, 81 S.Ct. at 1839. It is the balancing as to particular conduct of the VIBA which we must undertake.

The balancing test referred to in *Lathrop* has been developed in a series of union or agency shop cases. In *Railway Employees Department v. Hanson*, 351 U.S. 225, 238, 76 S.Ct. 714, 721, 100 L.Ed. 1112 (1956), the court approved the compelled payment of agency fees to a union in the face of a First Amendment challenge, finding that the legitimate interest of Congress in labor peace was such that it overbore the First Amendment interest of the workers not to be forced to contribute to the union. In *International Association of Machinists v. Street, supra*, and *Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), the Court determined that the First Amendment did not prohibit the forced contribution of agency fees so long as the funds were used for purposes germane to the essential functions of the union. *See Robinson v. State of New Jersey*, 741 F.2d 598 (3d Cir.1984). In *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court applied the line of railway union cases to a situation involving public employee unions. The court found that activities germane to the union's function—collective bargaining—may be funded by compelled dues, even if legislative activity

were a part of that process; it found, however, that the union was prohibited by the First Amendment from spending compelled dues of dissenters "for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective bargaining representative." 431 U.S. at 235, 97 S.Ct. at 1800; *see Chicago Teachers Union v. Hudson,* —— U.S. ——, ——, 106 S.Ct. 1066, 1073, 89 L.Ed.2d 232 (1986).

In *Ellis v. Railway Clerks, supra,* the Court gave some guidance as to the application of the balancing test in the context of a challenge to agency fees paid to a union. The Court applied the test to three activities: a national convention, social activities, and the publication of a newsletter to the extent that it did not report on "political causes." [4] The court found that these activities were within the scope of the legitimate function of the union. The Court noted that the First Amendment concerns, at least with respect to the convention and the newsletter, were "serious." It nevertheless held that these activities caused "little infringement of First Amendment rights beyond that already accepted, and none that is not justified by the governmental interests behind the union shop itself." 466 U.S. at 456, 104 S.Ct. at 1896.

In *Robinson v. State of New Jersey, supra,* the Third Circuit discussed the above line of cases in evaluating a public employee union claim. It remanded the case to the district court, finding that the trial court had incorrectly held under *Abood* that a teacher's union may not expend compelled dues for the purpose of legislative lobbying. After canvassing the line of cases culminating in *Ellis,* the court found that courts must look to the *purpose* of activities and not their *form* in determining whether remedial actions are necessary. Specifically, the court found that the lobbying efforts undertaken by the union were permissible so long as they were "pertinent to the duties of the union as a bargaining representative and not used to advance the political and ideological positions of the union." 741 F.2d at 609. This holding was based on two factors: first, the court found that to hold otherwise would unnecessarily cripple the union, frustrating the legitimate government purpose, and second, it found that the contrary ruling could hamper the expressive rights of the non-dissenting members:

> the First Amendment is not an insuperable obstacle to the effective representation of a bargaining unit by a union, either in the private or public sectors. Unions advancing the collective interests of the employees they represent need not shoulder the financial burden of non-members simply because effective representation necessarily includes taking positions on the issues affecting the membership. To conclude otherwise would diminish the expressive rights of the majority of employees whose full union contributions would be depleted to cover the costs incurred in the representation of free riders. Such a result is not required by the First Amendment.

741 F.2d at 610.

In assessing the cross-motions for summary judgment as to the First Amendment claims, our task is to determine, using the functional approach developed in *Ellis* and *Robinson,* whether the social and legislative activities of the VIBA are germane to its legitimate functions, or whether they are outside the scope of its required function. The former finding would require the fashioning of a remedy for the dissenting members. *See Robinson,* 741 F.2d at 610–14.

■ We find that the "political" activity of the VIBA—essentially the analysis of legislation and constitutional initiatives and the public dissemination of the resulting opinions—is within the legitimate, essential functions of the integrated bar. We recognize that the legislative activities under-

---

4. The propriety of several other activities were also before the court. They were not, however, subjected to the First Amendment balancing test because the court found them to be prohibited by the Railway Labor Act.

taken by the VIBA go beyond those found proper in *Ellis* and *Abood,* and in other agency fee cases. We believe that the functional approach outlined in *Robinson* mandates that we take into account, in making this assessment, the differences between the goals and purposes of a labor union, and those of an integrated bar association. Attorneys have long been regarded as quasi-public officials—"officers of the court." Their expertise in social, legal and legislative matters has traditionally been regarded as being, in some regards, in the public domain. It is clear that the District Court, in ordering the integration of the bar, did not intend that it be merely a guild for the preservation of the profession. The language of the petition for integration, the language of the bylaws made a part of the order, and the language of the order itself evidence an intention on the part of the court to unify the bar in order to facilitate and amplify the social benefit to the court, the bar, and the Territory of an organized, well-funded and formally recognized association of lawyers.

The activities raised by the plaintiffs in Civil No. 84/5 which are legislative in nature are obviously activities which the District Court anticipated and which society has traditionally expected of members of the bar. We cannot find that testimony before the legislature, pursuant to a Senator's invitation, or the formulation, through the committee process, of a coherent policy with respect to a complex body of legislation is beyond the necessary bounds of a unified bar's activities.

This conclusion is supported by the reasoning of the many state courts which have upheld the activities of integrated bars. *See, e.g., Falk v. State Bar of Michigan,* 418 Mich. 270, 342 N.W.2d 504, 514 (1983); *In re Florida Bar Board of Governor's Action,* 217 So.2d 323 (Fla.1969). We find further support in the concurring opinion of Justice Harlan in *Lathrop.* Justice Harlan, with Justice Frankfurter joining him, would have reached the specific instances of alleged political activity on the part of the State Bar of Wisconsin which the plurality opinion found not properly before the

Court. Justice Harlan found that *Hanson, supra,* compels the finding that the expression of opinions on legislative and legal matters are part and parcel of the business of a bar association, just as the fashioning of a collective bargaining agreement is the business of a labor union. 367 U.S. at 860–61, 81 S.Ct. at 1846–47. The conclusion was stated in the following terms:

> The *Hanson* case, 351 U.S. 225 [76 S.Ct. 714, 100 L.Ed. 1112], decided by a unanimous Court, surely lays at rest all doubt that a State may Constitutionally condition the right to practice law upon membership in an integrated bar association, a condition fully as justified by state needs as the union shop is by federal needs.
>
> \*   \*   \*   \*   \*   \*
>
> The Integrated Bar was in fact treated as such an *a fortiori* case in the *Hanson* opinion itself.
>
> \*   \*   \*   \*   \*   \*
>
> That being so, I do not understand why it should become unconstitutional for the State Bar to use appellant's dues to fulfill some of the very purposes for which it was established.

367 U.S. at 849–50, 81 S.Ct. at 1841.

■ We find this reasoning compelling, and we find that the record in this case is such that the First Amendment claims must be dismissed. The Supreme Court plurality determined not to address the issue in *Lathrop* because the record did not allow it to determine what issues were the subject of public comment and what the content of that commentary was to which members objected. In this action, we have been presented the specific instances of public commentary to which the dissenters object. We have invited supplemental submissions by the parties on this issue, and we have been assured that all relevant instances of VIBA law reform action have been brought to our attention. We find that only one example of public commentary advanced by the plaintiffs as objectionable falls without the limits of the proper functioning of a bar association. That ex-

ample is the VIBA's public expression of disapproval of a candidate for appointment as United States Attorney for the Virgin Islands. As that incident appears on the present record to be a deviation from the normal course of dealings of the VIBA, and as there are no allegations that any funds other than the cost of three telegrams were expended in the course of this incident, we find that it is no more than a *de minimus* infringement of the constitutional rights of those members who disagreed with the publicly expressed opinion.

The other public commentary followed a proper pattern: consultation with the membership, consideration by a committee or the Board of Governors, and the production of an opinion intended only to air an authoritative, considered view of an issue, and not intended to advance the partisan or financial statute of any member. We find that this conduct, on balance, does not constitute an impermissible infringement of dissenters' constitutional rights.

The social activities are also within the limits of the legitimate functions of the VIBA. The financial records presented, as explained by the affidavits submitted, demonstrate that most of the social activities cost the non-participating members little or nothing, as they were largely supported by the persons attending. To the extent that these social activities call for First Amendment analysis, *see Ellis*, 466 U.S. at 456, 104 S.Ct. at 1896, we find that they properly serve the function of enhancing interaction and sharing of knowledge among the members. This analysis is not altered by the objection of plaintiff Davis that her religion prohibits her from consuming alcoholic beverages or dancing. The largely self-supporting nature of the activities reduces the extent to which she is forced to support activities in which she may not fully participate. These factors compel the conclusion that the social activities do not impermissibly infringe on her religious freedom. *See Falk v. State Bar of Michigan, supra.*

We conclude that no material factual disputes exist as to the violation of the First Amendment rights of the plaintiffs in Civil No. 84/5, and that summary judgment must be granted to the VIBA on the counts of the complaint relying on that claim. *See Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Factual disputes do exist, and the contours of the VIBA's activities are hazy around the edges. Plaintiffs in 84/5 have had ample time to present evidence to the court of impermissible conduct on the part of the VIBA, and they have failed to convince us that such evidence will be forthcoming. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no 'genuine issue for trial.' " *Matsushita Electric, supra*, at ——, 106 S.Ct. at 1356.

III. *The Fee Increase*

The plaintiffs in 84/5 and the VIBA (collectively, "attorneys") challenge the increase in the licensing fee from $100 to $300. They present three theories by which they argue the increase can be held unconstitutional. They argue that the increase is confiscatory and excessive, and therefore a violation of the Due Process Clause of the Fifth and Fourteenth Amendments, that the increase, along with the mandatory bar fees constitute a "double tax," and that the increase is a violation of their rights under the Equal Protection Clause, applicable to citizens of the Virgin Islands through Section 3 of the Revised Organic Act of the Virgin Islands, 48 U.S.C. § 1561. The Government of the Virgin Islands contends that the increase is rationally related to a legitimate government interest in raising revenue, that it is not unconstitutionally confiscatory, and that it should not be struck down as a double tax. We address the cross-motions of these parties for summary judgment on these issues.

The plaintiffs in 84/5 argue that the imposition of mandatory dues for membership in the VIBA and in addition a $500 licensing fee for all attorneys is an impermissible "double tax." In their brief in

support of their motion for summary judgment, they provide no argument or legal citation to support this assertion. We find that the increase may not be invalidated on this basis. To the extent that a viable argument related to "double taxation," exists, *see Maass v. Higgins*, 312 U.S. 443, 449, 61 S.Ct. 631, 634, 85 L.Ed. 940 (1941), it has generally been applied to situations involving the assessment of income taxation twice on the same gain, *see Verkouteren v. District of Columbia*, 433 F.2d 461 (D.C.Cir.1970), or the imposition of taxes by two sovereigns, *see Fort Mojave Tribe v. San Bernardino County*, 543 F.2d 1253 (9th Cir.1976). We are unable to locate any authority by which we may question the imposition of two fees for two separate uses. The VIBA dues pay the expenses incident to the management of a bar association. The licensing revenue is divided in such a manner that $200 of each fee payment collected funds the District Court libraries, while $300 goes to the General Revenue fund of the Government of the Virgin Islands. We are aware of no authority which prohibits such an arrangement.

█ The plaintiffs next assert that the fee is so high that it is confiscatory. This assertion is not supported by reference to any evidence establishing that movants are unable to practice by reason of the fee increase. Even if such supporting documentation had been provided pursuant to Rule 56, FED.R.CIV.P., we would deny the motion on these grounds. In addressing a similar claim the Supreme Court stated,

> The claim that a particular tax is so unreasonably high and unduly burdensome as to deny due process is both familiar and recurring, but the Court has consistently refused either to undertake the task of passing on the "reasonableness" of a tax that otherwise is within the power of Congress or of state legislative authorities, or to hold that a tax is unconstitutional because it renders a business unprofitable.

*Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 373, 94 S.Ct. 2291, 2294, 41 L.Ed.2d 132 (1974).

█ It is the heart of the attorneys' attack on the increase that it is invidiously discriminatory against attorneys, is patently arbitrary, and bears no relationship to a permissible state objective.[5] *See Port Construction Co. v. Government of the Virgin Islands*, 359 F.2d 663 (3d Cir.1966). We initially reject the argument that attorneys are singled out by this increase, as the evidence does not support any such conclusion.[6] The question of rational basis, how-

5. The plaintiffs in Civil No. 84/5 also argue that the increase is invalid as underinclusive because, by the terms of 27 V.I.C. § 306, agencies of government are exempt from licensing fees. The exemption of government attorneys from the licensing fees obviously bears a rational relationship to the government's interest in maintaining a competent staff. The benefit which accrues to a government attorney as a result of gaining an exemption from the fee requirement allows the government to conserve payroll resources.

6. The attorneys argue that they are among "only a handful" of occupations and business singled out for severe increases in fees. The figures contained in the Exhibits to the VIBA's brief in support of their motion for summary judgment, Exhibit B, does not bear this assertion out. The increase for attorneys was $400, representing a 500% increase. The fees for the following occupations and businesses were also increased by at least 500%:

Air cargo transportation, armored car service, barber, blender of alcoholic beverages, bowl-ing alley, business courses & related training, butchers, clinical laboratory, cockfighting, commercial school, commodity exchange clearing house, concrete pumping, dealers in explosives and firearms, dental laboratory, gasoline station, several categories of general manufacture, health club or spa, ice manufacturing, manicurist, medical laboratory, mortgage broker, motor vehicle dealer, pharmacy, prime distiller of alcoholic beverages, printing and publishing house, radio station, scheduled air service, tavernkeepers, and television stations.

The fees in the following occupations and businesses were also increased by at least $400:

Air cargo transportation, blender of alcoholic beverages, cockfighting, dealers in explosives and firearms, motor vehicle dealers, prime distillers of alcoholic beverages, radio station, scheduled air service, and television stations.

On the basis of this record, it is impossible to infer that attorneys were singled out for disparate treatment. Because the facts render the theory of disparate treatment implausible, and

ever, presents a significant issue. The attorneys contend that the method by which increases were calculated were so haphazard and without basis that they must be considered arbitrary government actions and contrary to the equal protection guarantees of the Fourteenth Amendment. The process by which the increases were calculated is described in the deposition of Mrs. Joseph, who was at all relevant times the Director of the Virgin Islands Consumer Services Administration ["CSA"]. In 1983, she was asked by the legislature to revise all licensing fees (T23).[7] Mrs. Joseph and members of her staff, including the supervisor of licensing for St. Croix, calculated the increases during meetings over a period described by Mrs. Joseph as lasting from several days to over two weeks (T30). In reaching their determination with respect to the increase in attorney's fees, the CSA staff did not contact the VIBA, any attorney, or any other government agency in order to determine the level of income of attorneys in the Virgin Islands (T30–31). They based their decision to increase the fee for attorneys on two factors: the professional status of attorneys, and their personal understanding of the fees which attorneys charge their clients—in other words, their understanding of attorneys' income (T31–32). Although the CSA staff did not consult any statistical information regarding attorneys' income, they did determine the licensing fees paid by attorneys in other states (T33). They settled upon "fees based on what the attorneys could pay" based on what they assumed to be attorneys' income, with the intention of fulfilling their mission to increase fees in an attempt to increase the general revenues of the Territory (T33, 39). The fees were increased pursuant to the CSA recommendations without further interaction between the CSA staff and the legislature (T47); *compare,* Exhibit A to the Joseph deposition to the figures in Act No. 4877, the Omnibus Authorization Act of 1984.

■ The attorneys argue that this process was random, and so arbitrarily derived that it does not bear a rational relationship to a legitimate governmental interest.[8]

In assessing this equal protection challenge to a taxing measure, we must be conscious of the rule that the presumption of constitutionality which surrounds legislative actions generally is strongest in the area of taxation. *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973) *citing Madden v. Kentucky,* 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940). The party challenging the tax must bear a heavy burden, overcoming an assumption that the local legislature was aware of local conditions affording a reasonable basis for the level of tax. *Lehnhausen,* 410 U.S. at 364, 93 S.Ct. at 1006, *citing Carmichael v. Southern Coal Co.,* 301 U.S. 495, 510, 57 S.Ct. 868, 872, 81 L.Ed. 1245 (1937).

■ The Third Circuit set out the test to be applied in a case of this nature in *Price v. Cohen,* 715 F.2d 87 (3d Cir.1983) *cert. denied,* 465 U.S. 1032, 104 S.Ct. 1300,

---

because the attorneys have failed to present any additional evidence to support the theory, the motion of the government must be granted as to the claim of disparate treatment. *See Matsushita Electric, supra,* —— U.S. at ——, 106 S.Ct. at 1355.

7. "T23" refers to page 23 of the affidavit of Helen Joseph, taken February 21, 1985.

8. They also argue that the increase was not rationally related to the stated goal of raising general revenues, because a statute in effect at the time the Omnibus Authorization Act was passed increasing fees mandated the payment of all attorney licensing fees not into general revenues, but rather into the Law Library Fund. 4

V.I.C. § 442. Corrective legislation was passed in 1984, however, by which funds from attorney's licensing fees were divided, with $200 going to the Law Library Fund and $300 going to the general treasury. Act No. 4902 (1984).

It appears that the government—at least in the person of Mrs. Joseph—believed at the time the fee increases were calculated that 4 V.I.C. § 442 required only *half* of attorney's fees to be paid to the Law Library Fund (T17–18). This belief was, of course, an error. The 1984 remedial legislation had the effect, however, of directing the fees to those funds for which they were intended when the increases were calculated. This swiftly remedied error does not impair the validity of the fee increases contained in the Omnibus Authorization Act of 1984.

79 L.Ed.2d 700 (1984). "When the classification employed by the state burdens the exercise of fundamental rights, strict judicial scrutiny is required." 715 F.2d at 93. In this case, the tax impinges on the right to engage in regulated businesses and occupations, and does not concern fundamental rights. *See Evanston Insurance Co., Inc. v. Merin,* 598 F.Supp. 1290, 1314 (D.N. J.1984). We must therefore apply the rational relationship test:

> Under the rational relationship test, challenged legislation will be upheld unless a plaintiff can demonstrate that the classification is at issue does not bear a rational relationship to a legitimate state interest.
>
>   \*    \*    \*    \*    \*    \*
>
> It is important to bear in mind that the rational relationship test is highly deferential. "A classification does not offend against [the equal protection] clause merely because it is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).
>
>   \*    \*    \*    \*    \*    \*
>
> While deferential, the rational relationship test is not "toothless." *U.S. Railroad Retirement Bd. v. Fritz,* 449 U.S. [166,] 184, 101 S.Ct. [453,] 464, [66 L.Ed.2d 368 (1980) ] (Brennan J., dissenting).

715 F.2d at 94 (citations and footnotes omitted).

The rational relationship test has two parts. First, we must determine whether the goal which the Territory attempts to advance concerns legitimate state interests. Second, we must determine whether the tax is "rationally related" to this goal. In this case, the parties agree that the purpose of the fee increase was to raise general revenues. *See* Exhibit C to the VIBA's brief in support of its motion for summary judgment; Joseph Deposition, (T37–40). The question posed by the cross-motions is whether the increase in attorney's licensing fees from $100 to $500 per year was a rationally conceived means to reach the goal of increased revenue.

  ■  The record in this case demonstrates that the Government of the Virgin Islands did not undertake the fee schedule modification process in a systematic and scientific way. Mrs. Joseph was candid in her deposition testimony in describing the process. She testified that the CSA staff relied primarily on their own informal knowledge of the relative income levels of persons in various professions and businesses in computing recommended increases. The legislative history indicates that the recommendations of the CSA were adopted by the legislature largely without change. There is no indication that the legislature undertook any studies in an attempt to validate the assumptions underlying the CSA figures.

We must find, however, that the power of this court does not permit us to review and criticize the methods by which the Territory devises taxing schedules. The Equal Protection Clause was not meant to create "'an iron rule of equal taxation' ... The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Madden v. Kentucky, supra,* 309 U.S. at 88, 60 S.Ct. at 408. We may not substitute our own judgment for that of the legislature, and we may not find the taxing schedule invalid because it is based on an informal estimate and is guided by considerations of administrative ease. *Carmichael v. Southern Coal Co., supra,* 301 U.S. at 511, 57 S.Ct. at 873. In the area of economic legislation, even illogical or unscientific estimates are permissible if there is a "plausible" basis for sustaining it, even a basis provided not by the legislature but by the court. *Price v. Cohen, supra,* 715 F.2d at 94.

We cannot find that it was implausible or irrational for the legislature to determine that the fee increase for attorneys was appropriate given their understanding of relative income levels in the Territory. That the CSA and the legislators have an informal, albeit unscientific understanding

of the general economic status of attorneys in relation to other persons, is a reasonable assumption and one that is not disputed by the attorneys in this action. The attorneys argue that the means by which the classification was done was so haphazard as to allow us to find that the figure for the fee increase was random and arbitrary and not related to a rational choice. *See Schweiker v. Wilson,* 450 U.S. 221, 236, 101 S.Ct. 1074, 1083, 67 L.Ed.2d 186 (1981). We find their argument unpersuasive. Were we to subject this fee schedule to heightened analysis, or were we reviewing an agency decision pursuant to a substantial evidence standard, *see* 5 U.S.C. § 706(2)(E); *Kelly v. Railroad Retirement Board,* 625 F.2d 486 (3d Cir.1980), we might find merit in the attorneys' challenge. In this case, however, the Government, in pursuit of a legitimate goal (increased general revenue) increased the schedule of licensing fees by a substantial amount. The increase in attorney's licensing fees, while in the upper range to those approved, is similar both in percentage and absolute increase to that of other classifications. The process by which the figures were computed, while not scientific, was rational. Given the great deference due the legislature in the area of economic classification, we cannot find that a question of fact exists as to the constitutional validity of the increase for attorneys. We will grant the Government's summary judgment motion in its entirety.

### IV. *Due Process*

■ In Count X of the complaint in Civil No. 84/5, the plaintiffs complain that they are not afforded hearings "on the constitutionality of the Virgin Islands Bar Association and dues assessed by said association." Plaintiffs have now been afforded a full hearing, and a full opportunity to raise any challenge they have to the constitutionality of the VIBA. We do not find any support for the assertion that any defendant in this action has deprived plaintiffs in Civil No. 84/5 of their due process rights in this regard. Once a civil action was filed, the constitutional questions became subject to the adversary process.

During the course of oral argument on these cross-motions, and in some of the papers submitted in connection with this action, the suggestion was raised that attorneys were entitled to a hearing on the question of whether dues had been paid or not. We find that this issue is not raised in the pleadings, and that it is not therefore before us. Were we to reach the issue, we would be guided by the discussion of the topic by Judge Higginbotham, then District Court Judge for the Eastern District of Pennsylvania, in *Cantor v. Supreme Court of Pennsylvania,* 353 F.Supp. 1307 (E.D.Pa.1973). In that case Judge Higginbotham found that the payment of dues *vel non* was not a factual issue which required an adversary hearing in order to satisfy the due process clause. He held that the issue could be settled by the submission of a cancelled check or other suitable proof of payment. We agree that such summary procedure is appropriate for the resolution of such a simple factual issue. Dissatisfaction with the decision in the District Court may be addressed through appeal to the Third Circuit or through application for a writ of mandamus. No further remedy is necessary, at least on the informal information submitted in connection with this action.

### V. *Motion to Amend*

■ The plaintiffs in Civil No. 84/5 have filed a motion to amend their complaint. The primary change presented is the deletion of Count IX from the complaint. The other changes involve more detailed requests for relief and the addition of some factual material. No substantive counts are added. The amendment will be granted. No responsive pleading need be filed.

### VI. *Petition of Frank Padilla*

On November 15, 1985, the petition of Frank Padilla for the disintegration of the Virgin Islands Bar Association was consolidated with Civil No. 84/5 and 84/38. In response to the motion to consolidate, Pa-

dilla states that "[t]he facts and questions of law are basically the same as in Civil No. 5/1984...." We have examined the petition, and we do not understand it to raise factual or legal issues not addressed in this action. We request that Mr. Padilla submit an informal letter brief, no later than 30 days after the filing of the order accompanying this opinion, setting forth the reasons, if any, why this court should not deny and dismiss his petition for the reasons stated above. Any interested party may respond to Mr. Padilla's pleading within 15 days of its filing. If we do not receive a timely submission from Mr. Padilla, his petition will be denied and dismissed.

## VII. *Conclusion*

For the reasons stated above, we find that the VIBA's motion for summary judgment must be granted, dismissing all challenges to the constitutionality of the Virgin Islands Bar Association. We also find that the Government of the Virgin Islands' motion for summary judgment regarding the validity of the increase in attorney's licensing fees from $100 to $500 must be granted. The attorneys' cross-motion will be denied. We will grant the motion of the plaintiffs in Civil No. 84/5 to amend their complaint, and we will require no responsive pleading. The due process claims are dismissed. We will dismiss the petition of Frank Padilla to dissolve the Virgin Islands Bar Association unless he submits reasons for our determining otherwise within 30 days of the filing of the order accompanying this opinion.

## ORDER

This matter having come before the court on cross motions, and the court having considered the argument of counsel and the submissions of the parties and for good cause shown;

It is on this 30th day of September 1986,

ORDERED that the motion of plaintiffs in 84/5 to amend their complaint is hereby granted, and that no responsive pleading need be filed; and it is further

ORDERED that the motion of the Virgin Islands Bar Association for summary judgment on all claims in Civil No. 84/5 attacking the constitutionality of the Virgin Islands Bar Association be granted and that the cross-motion of the plaintiffs in Civil 84/5 for summary judgment on their claims regarding the constitutionality of the Virgin Islands Bar Association is denied and that all claims raised in Civil 84/5 are dismissed; and it is further

ORDERED that the motion of the Government of the Virgin Islands regarding the licensing fees for attorneys is granted and that all claims raised in Civil 84/38 are dismissed; and it is further

ORDERED that the motions for summary judgment of the Virgin Islands Bar Association, Britain H. Bryant, John E. Stout, Brenda Hollar, Stedmann Hodge, Charlotte L. Poole-Davis and Clarice A. Bryan regarding licensing fees for attorneys are denied.